UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JAMARCUS JACKSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No.:    3:23-CV-54-DCLC-JEM |
| | ) | |
| BRIAN ELLER, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Jamarcus Jackson filed a federal habeas petition under 28 U.S.C. § 2254 challenging the constitutionality of his confinement under 2017 Washington County judgments of conviction for second-degree murder, misdemeanor assault, and misdemeanor reckless endangerment [Doc. 1]. Having considered the submissions of the parties, the state-court record, and the law applicable to Petitioner's claims, the Court finds that an evidentiary hearing[1] is not warranted, the petition should be **DENIED**, and this action should be **DISMISSED**.

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

On March 23, 2014, Petitioner shot and killed Deshaun Greer ("the victim") outside of The Battery, a Johnson City nightclub [Doc. 11-1, p. 5]. Zachary Breedlove and Jonathan McInturff, two patrons of The Battery that evening, were also injured during the shooting [*Id*. at 5–6]. Petitioner was indicted by a Washington County Grand Jury on charges of first-degree murder,

---

[1] "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rule(s)"); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (providing an evidentiary hearing not required where record refutes the petitioner's allegations or otherwise precludes habeas relief).

attempted second-degree murder, aggravated assault, and felony reckless endangerment [*Id*. at 14].

Prior to trial, the prosecution filed notice of its intent to use Petitioner's criminal convictions for

failure to appear, aggravated assault, and robbery for impeachment purposes [*Id.* at 25], and the

defense filed a motion to prohibit their use [*Id*. at 29–30]. The trial court granted the defense's

motion as to the aggravated assault and failure-to-appear convictions but denied it as to Petitioner's

robbery conviction [*Id*. at 40]. During Petitioner's jury trial, the trial court granted Petitioner's

motion to dismiss the attempted second-degree murder charge for failing to charge an intentional

mental state [Doc. 11-1 p. 31–34, 39; Doc. 11-7 p. 37–39].

The Tennessee Court of Criminal Appeals ("TCCA") recounted the proof presented at

Petitioner's trial as follows:

> Amanda Chappell[] testified that she had been on two or three dates with the
> [Petitioner] before March 23, 2014. She said that on the night of the relevant events,
> they went to The Battery to celebrate the [Petitioner]'s birthday. She said she picked
> up the [Petitioner] in the late evening, although she did not recall the time. She said
> that as she drove, she saw that the [Petitioner] had a small gun in the floorboard.
> She said the gun was not a revolver but did not know if it was a semi-automatic
> weapon. She said she was "[a] little bit" concerned about the [Petitioner]'s having
> the gun. She did not know where the gun was located when they got out of the car
> at the club.
>
> Ms. Chappell testified that she bought drinks for the [Petitioner] in the club but did
> not recall how many. She said that she saw the [Petitioner] talking with a man and
> that the [Petitioner] held a beer bottle as if he were going to hit the man. She said
> the victim was walking around while the [Petitioner] and the man talked.
>
> Ms. Chappell testified that she and the [Petitioner] were about to leave when she
> saw the victim and someone who resembled the victim looking at the [Petitioner].
> She said she later learned the men were brothers. She said she was concerned that
> an altercation might occur. She said that as she and the [Petitioner] stood by the bar
> in the back of the club after the [Petitioner] finished his conversation, the victim
> "bumped" the [Petitioner] intentionally and bumped her. She later said she lost her
> footing when the victim bumped the [Petitioner], causing the [Petitioner] to bump
> into her. She said the victim and the [Petitioner] had words. She said, "[T]he
> younger brother cuts in front of [the Petitioner,] and they're right in each other's
> face." She said she told the "other guy" to "leave it alone" and told the [Petitioner]
> that she and the [Petitioner] should leave. She said she was concerned about the

[Petitioner] getting into a fight because "there had already been previous arguments that night" and because the [Petitioner] had been drinking. When asked whether he was sober, she responded, "[H]e shouldn't be driving."

Ms. Chappell testified that she saw the victim approach after the [Petitioner] and "the younger brother were talking." She said that the younger brother gestured as if he were pointing at the [Petitioner] and that fights involving ten to twelve men broke out. She said the [Petitioner], the victim, and the victim's brother did not fight. She did not know the time but thought the club's lights had come on, signaling "last call." She said the bouncers attempted to get the patrons to leave because things were "out of control."

Ms. Chappell testified that she saw the [Petitioner] leave and attempted to follow but had difficulty because she wore high heels. She said that she asked him to wait for her but that he did not. She said the [Petitioner] did not sprint but moved quickly to her car, which was a distance away. She said the [Petitioner] was angry, which was a state in which she had never seen him. She said he was loud and "breathing hard." She said that when she reached the car, the [Petitioner] stood by the passenger side waiting for her to unlock it. She said the [Petitioner] searched the floorboard and asked, "Where's my gun[?]" She later said that he asked, "[W]here the F is my gun" and that he forcefully slammed back her car seat. She said she told the [Petitioner] that "a man sitting down there . . . saw him" get into her car. She said that she asked the [Petitioner] what he wanted her to do and that he told her she could leave if she wanted. She said she replied that she was not going to leave the [Petitioner] there.

Ms. Chappell testified that she saw the [Petitioner] put the gun in the back of his pants and walk toward The Battery. She said she sat in the car for about one minute but returned to The Battery after hearing gunshots. She said that she saw someone lying down, that she looked at the person's shoes to see whether it was the [Petitioner], but that it was not. She looked for the [Petitioner] and found him lying at the bottom of some steps. She thought the [Petitioner] hit his head "because he wasn't . . . all there." She said that several people restrained the [Petitioner] and that she waited to leave until the police arrived and took the [Petitioner].

Ms. Chappell denied that any police officer told her not to talk to defense counsel but acknowledged she had spoken to the prosecutors once or twice. She said that she did not speak to the police that night and that the police did not know of her involvement "for a very long time." She acknowledged that she had not told the police about the [Petitioner]'s asking where his gun was when they returned to the car after being inside the club. When asked why she did not tell the police initially about having seen the [Petitioner] put the gun into his pants, she said she had been nervous. When asked about the current state of her relationship with the [Petitioner], she said she had not spoken to him in a long time.

John Calandros testified that he was employed as a bouncer at The Battery on March 23, 2014. Mr. Calandros said that he began focusing on the [Petitioner] after seeing the [Petitioner] in an incident with a patron other than the victim. When Mr. Calandros was asked if he saw the [Petitioner] become involved in an incident with the victim or the victim's brother, Mr. Calandros said, "[I]t looked like they kind of bumped shoulders and started talking aggressively toward one another." Mr. Calandros said that both men appeared to have hostility toward one another during this encounter. Mr. Calandros did not know where the victim's brother was during the exchange and did not see any encounter between the [Petitioner] and the victim's brother inside the bar. Mr. Calandros said that he and another bouncer, Aaron Phillips, separated the men and that the [Petitioner] punched Mr. Phillips in the face. Mr. Calandros said that a fight erupted between the victim's younger brother and a person whose name Mr. Calandros did not know. Mr. Cal[]andros said he had not seen the entire interaction between the [Petitioner] and Mr. Phillips because Mr. Calandros had to attend to another fight. Mr. Calandros agreed that the atmosphere inside the club became chaotic shortly before the bouncers began herding the patrons outside due to the fighting.

Mr. Calandros said that the victim and the victim's brother wanted to go outside and that the victim stated the [Petitioner] had hit him in the face with a beer bottle. Mr. Calandros explained that he had not seen the [Petitioner] strike the victim but that he saw a "large pumpknot" on the victim's face. Mr. Calandros stated that the [Petitioner] "had fled" by this point. Mr. Calandros stated, however, that he did not see the [Petitioner] leave but that he did not see the [Petitioner] inside the club after the patrons had been herded outside. Mr. Calandros said the victim stated that he had bail money and did not care if he went to jail for fighting. Mr. Calandros said he calmed the victim, who initially wanted to retaliate and fight the [Petitioner]. Mr. Calandros said that he tried to keep the victim inside to keep the victim away from the [Petitioner] and that he [sic] them outside. Mr. Calandros explained that he calmed the victim's brother more than the victim because the victim's brother was agitated about the fight in which he had been involved. Mr. Calandros stated that a large crowd of fifty to 100 people was gathered outside.

Mr. Calandros testified that he did not usually work in the parking lot but that he had followed the victim and the victim's brother to ensure that they left. He said he heard the crowd saying, "[T]here he is, get him." Mr. Calandros said that the victim turned and that Mr. Calandros saw the [Petitioner] "coming up the street" on foot with his hands at his sides. Mr. Calandros said the victim turned and walked casually toward the [Petitioner] until they were four to six feet apart. Mr. Calandros said that the victim's brother also walked toward the [Petitioner] but that the victim was closer to the [Petitioner] than the victim's brother. Mr. Calandros stated that the [Petitioner] pulled out a gun from the [Petitioner]'s mid-back and began shooting. Mr. Calandros stated that he heard a couple of shots, that he felt something possibly grazing his leg, and that he dove down. He said he heard more than five shots. He said that everything happened within a matter of seconds. Mr.

Calandros said that although the victim had been "riled up" earlier, the victim was calm by the time the victim walked outside.

Mr. Calandros testified that by the time he stood, another bouncer, Michael Parr, was on top of the [Petitioner] in the lower parking lot. Mr. Calandros stated that another bouncer, "Devin," assisted Mr. Parr in restraining the [Petitioner]. Mr. Calandros said the location where the bouncers had restrained the [Petitioner] was different than where he had last seen the [Petitioner] before Mr. Calandros dove to the ground. Mr. Calandros stated that Mr. Phillips took the gun from the [Petitioner] and that one of the club's disc jockeys, John Lawson, kept the gun until the police arrived.

Mr. Calandros testified that the victim's brother was in the lower parking lot trying to get to the [Petitioner] while the [Petitioner] was restrained. Mr. Calandros said Mr. Parr kept the victim's brother from attacking the [Petitioner] while the [Petitioner] was restrained. Mr. Calandros said he had not seen any interaction between the [Petitioner] and the victim's brother before the shooting. Mr. Calandros was unsure where the victim's brother had been when the shooting began. Mr. Calandros identified the [Petitioner] as the person he saw firing shots on March 23, 2014.

James Phillips testified that he was employed working "security" at The Battery on the early morning of March 23, 2014. He said that the victim punched him in the face with a fist, knocking him to the ground. Mr. Phillips said that he had not interacted with the victim before the victim hit him and that Mr. Phillips had been "dealing with" someone else at the time. Mr. Phillips said that he stood and told a bouncer what had happened but that the victim had already left the club. Mr. Phillips said he did not see the victim and the [Petitioner] interacting inside the club.

Mr. Phillips said he and other employees cleared the club of patrons and began "doing our sweeps in the parking lot just like a normal night." He said that at some point, he saw the [Petitioner] coming from the side of the building toward the front steps of the club. Mr. Phillips agreed that the [Petitioner] appeared agitated. Mr. Phillips said the victim noticed the [Petitioner] at about the same time. Mr. Phillips said that a bouncer put his hand on the victim and said, "[J]ust let it go," but that the victim "took off." Mr. Phillips said the victim ran toward the [Petitioner]. Mr. Phillips said the [Petitioner] took out a gun and began firing when the [Petitioner] and the victim were within five feet of each other. Mr. Phillips said that he "[h]it the ground" and that he heard numerous shots. Mr. Phillips said that the [Petitioner] tried to run toward some steps but was tackled by Mr. Parr. Mr. Phillips said that the victim was in the lower parking lot but that Mr. Phillips did not see how the victim ended up there. Mr. Phillips said that he stepped on the [Petitioner]'s hand as the [Petitioner] lay in the parking lot to get the gun away from the [Petitioner]. Mr. Phillips said that he cleared the gun's chamber and that a bullet fell to the ground in the lower parking lot. He said he did not know what happened to the

5

bullet. He said that he gave the gun to another person, whom he did not identify by name in his testimony, and that he performed CPR on the victim.

Mr. Phillips testified that he did not know that anyone else was with the victim and that he did not see anyone near the victim when the [Petitioner] shot the victim. Mr. Phillips said he did not see anyone other than the victim moving toward the [Petitioner]. Mr. Phillips estimated that about 200 people were outside the club during the incident and agreed that the victim had to run through the crowd to get to the [Petitioner]. He agreed that the environment outside the club was "raucous" and said he did not hear the victim make any statements about the [Petitioner].

John Lawson testified that he was a patron of The Battery on March 23, 2014, and that he was later employed at the club as a disc jockey. He said he was outside the club on March 23 around 1:00 a.m. and saw a man walk up the steps, pull a weapon from his pants, and shoot the victim in the chest from a distance of four to five feet. Mr. Lawson said the victim was not moving toward the [Petitioner] at the time of the shooting. Mr. Lawson said the victim "kind of froze" before the [Petitioner] brought out the gun. Mr. Lawson said that when the shots began, he tackled several people to the ground. Mr. Lawson said that the [Petitioner] fired until the [Petitioner] "ran out of rounds" and that Mr. Lawson went down the stairs after the [Petitioner] finished shooting. Mr. Lawson said he heard eight to ten or "maybe even more" shots. Mr. Lawson said the [Petitioner] looked as if he were going to run away but that Mr. Parr tackled the [Petitioner] in the lower parking lot. Mr. Lawson said he and others helped restrain the [Petitioner]. Mr. Lawson said that after a minute or two, he extricated himself from the people restraining the [Petitioner] and saw the gun "racked back" with nothing in it. Mr. Lawson said he took the gun inside the club and took it to Officer Cody Powell once the police arrived.

Mr. Lawson testified he had not seen any other individuals, including the victim's brother, with the victim but said he focused on the gun once the [Petitioner] produced it. Mr. Lawson estimated the crowd at thirty to fifty people.

Mr. Lawson testified that he saw other individuals, including the victim's brother, who had been hit by gunfire. He said that when he noticed that the victim's brother had been shot in the back, the victim's brother was in the parking lot at the bottom of the steps. Mr. Lawson said the victim's brother was "very upset" and "[j]ust really mad." Mr. Lawson acknowledged that he did not see the victim's brother being shot and that he noticed him later.

Johnson City Police Officer Cody Powell testified that he responded to a call at The Battery on March 23, 2014, around 3:00 a.m. He said that when he arrived, he saw three people who appeared to be victims, people screaming, and a chaotic scene. He said a man approached him [and] said the man had the gun. Officer Powell said he took the gun from the man and locked it in his trunk until he was able to give it

6

to Investigator Richardson. Officer Powell did not recall whether he received the magazine separately from the gun.

Johnson City Police Detective Matthew Keller testified that he responded to the hospital after the March 23, 2014 shooting at The Battery. He said he interviewed the victim's brother, who appeared to be injured and had a gauze patch on his shoulder. Detective Keller said the victim's brother was "very emotionally distraught" and had trouble focusing on answering Detective Keller's questions. Detective Keller did not know whether the victim's brother had received pain medication. Detective Keller said that the victim's brother did not appear to be in pain but agreed that a person who had been shot three times would have pain.

Zachary Breedlove testified that he and his friends were at The Battery on March 23, 2014. He said they arrived around midnight and left around 3:00 a.m. He said he had four or five drinks that evening. He said he was outside waiting for a taxi when he heard about six gunshots. He said he ran and was grazed by a bullet. He said he never saw the shooter. He identified a photograph of a graze wound to his right buttock, which he agreed resulted from his having been hit by a bullet or bullet fragment.

Mr. Breedlove agreed that he walked to a gas station and called a friend to pick him up and that he went to the friend's home without seeking medical attention. He said that seeking medical treatment would have been more of a financial burden than it was worth.

Jonathan McInturff testified that on March 23, 2014, he and his brother were at The Battery celebrating his brother's birthday. He said he was there from 11:00 p.m. until 3:00 a.m. He admitted he was intoxicated and said he "[s]omewhat" recalled an incident that occurred as he left the parking lot. Mr. McInturff said he heard shots and ran, although he did not know what precipitated the shooting. When asked if he had "some contact with" the shots, he replied, "Somebody made that assumption, but, the doctor never told me that I had no [sic] bullets in my arm." He agreed that his arm was "in pretty good shape" before he went to the club on March 23. When shown a photograph exhibit, he said it depicted a spot "like a burn mark" on his arm that he did not have before he went to the club. He said he noticed a burning sensation in his arm after the shooting. He said that he went to the hospital that evening and that an x-ray of his arm showed no metal or bullet fragments.

Johnson City Police Detective Bret Richardson testified that he investigated the scene. He said that ten .40 caliber cartridge casings, three bullet fragments, and a shoe were found. In addition, he said that he received three bullets which had been removed from the victim's body. He said he submitted the ballistic evidence and the gun to the Tennessee Bureau of Investigation (TBI) Laboratory.

TBI Forensic Scientist Teri Arney, an expert in firearms identification, testified that she examined a .40-caliber Smith & Wesson pistol, a magazine, ten cartridge

casings from the scene, and a bullet fragment submitted by the Johnson City Police Department relative to this case. Agent Arney determined that the cartridge casings and bullet fragment had been fired from the pistol.

Agent Ar[]ney testified that she later examined additional evidence, consisting of a bullet fragment and a bullet jacket from the scene and three bullets removed from the victim's body. She examined these items in conjunction with the pistol collected as evidence. She determined that the bullets from the victim's body had been fired from the pistol. She said that the items from the scene had the same rifling characteristics and were of the same caliber as the pistol but that they were too damaged to make a conclusive identification.

Nicole Masisan, M.D., an expert in forensic pathology, testified that she performed an autopsy of the victim's body. She said the victim had three gunshot wounds to the torso. She said one entered the left upper abdomen, penetrated the inferior vena cava and the aorta, and came to rest near the liver. She said a second entered the left lateral buttock, crossed through the abdomen, penetrated the rectum, and came to rest in front of the right hipbone. She said the third entered the left lower back, grazed the twelfth rib, and came to rest in the second lumbar vertebral body. She said that the shot to the left upper abdomen was fatal and that it was unlikely that either or both of the other two, on their own, would have killed the victim. She said that a gunshot such as the one to the victim's left upper abdomen would cause death "[p]otentially within seconds, definitely within minutes."

Dr. Masisan testified that the victim's blood alcohol content was 0.192 percent and that his urine tested positive for marijuana use. She said that the victim's face had a "red/black abrasion" on the left cheek with a surrounding bruise. She said that an abrasion could be caused by blunt force, a hit, a push, or a fall. She said it could have been caused by being hit with a bottle.

Dr. Masisan agreed that the victim was 6'4". She said that she had been unable to determine the distance from which the gunshots had been fired at the victim.

*State v. Jackson*, No. E2017-01182-CCA-R3-CD, 2018 WL 3409927, at *1–6 (Tenn. Crim. App. July 12, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018) ("*Jackson I*"). At the close of the prosecution's proof, the trial court declined to grant the defense's motion for a judgment of acquittal on the first-degree murder and the felony reckless endangerment charges [Doc. 11-8 p. 11–14]. But the court granted a judgment of acquittal on the aggravated assault charge, but allowed it to go forward on the lesser-included offense of simple assault [*Id.* at 14–17].

8

Petitioner elected not to testify in his own defense and rested based on the self-defense instruction given by the court [*Id.* at 32, 46–47]. While the jury deliberated, Petitioner put on an offer of proof as to what testimony he would have given if the trial court had not ruled that the state could use his prior robbery and failure to appear[2] convictions as impeachment evidence if he testified [Doc. 11-9 p. 12, 19–106].

The jury acquitted Petitioner of first-degree murder but found him guilty of the lesser-included offense of second-degree murder in connection with the victim's death [*Id.* at 123]. Petitioner was also found guilty of the assault of Zachary Breedlove [*Id.*]. The jury acquitted Petitioner of felony reckless endangerment of Jonathan McInturff but found him guilty of the lesser-included offense of misdemeanor reckless endangerment [*Id.*]. The trial court imposed a sentence of 40 years as a Range II multiple offender on the second-degree murder conviction and a concurrent sentence of 11 months 29 days on the two misdemeanor convictions [Doc. 11-1 p. 71–74; Doc. 11-12 p. 40–53].

The TCCA affirmed on appeal [Docs. 11-17, 11-18], and the Tennessee Supreme Court denied discretionary review [Doc. 11-21].

Thereafter, Petitioner filed a pro se petition for post-conviction relief alleging that he received the ineffective assistance of counsel at trial [Doc. 11-22 p. 4–12, 27–48]. Post-conviction counsel was subsequently appointed [*Id.* at 49–50] and filed an amended petition alleging, as relevant here, that counsel was ineffective for failing to subpoena Joshua Mould and Jamison Greer to offer testimony corroborating Petitioner's self-defense claim [*Id.* at 59–64]. The state filed an answer [*Id.* at 67–69]. Following an evidentiary hearing, the trial court denied the petition [Doc.

_____

[2] Although the trial court and defense counsel both referenced Plaintiff's failure-to-appear conviction during the offer of proof, the record reflects that the trial court had determined that conviction could not be used for impeachment purposes [Doc. 11-1 p. 40].

9

11-22 p. 73–96]. The TCCA affirmed on appeal, recounting the evidence presented at the evidentiary hearing in the trial court as follows: !

> Petitioner testified that he was standing by a railing when a group of people saw him and began screaming, "There he goes, go get him. Go get him. Go f*** him up." He said that both the victim and the victim's brother, Jamison Greer, began to charge him. He stated that club bouncer Joshua Mould grabbed the victim to stop him, but the victim broke free and continued running toward the Petitioner. The Petitioner testified that he did not shoot until the victim drew back to hit him.

> The Petitioner testified that he related the above account to trial counsel. He said he met "quite a few" times with counsel and at each meeting discussed with counsel the importance of having Joshua Mould and Jamison Greer as witnesses to corroborate the Petitioner's position that the victim was the first aggressor. Based on his repeated conversations with counsel, the Petitioner understood that both men were slated to testify as defense witnesses.

> The Petitioner testified that he was still operating under the belief that Joshua Mould and Jamison Greer were going to be part of the defense proof after the State had completed its proof and trial counsel asked him if he wanted to testify in his own defense. He said trial counsel advised him that it would not be in his best interest. He stated that he and trial counsel "agreed on that and everything else was supposed to be Joshua Mould, Jamison Greer and the rest of the bouncers to the defense." According to the Petitioner, trial counsel never even hinted at the possibility that Joshua Mould and Jamison Greer would not appear as defense witnesses.

> At this point in the hearing, post-conviction counsel described his unsuccessful attempts to locate or contact either potential witness. Post-conviction counsel requested that the court declare both men unavailable pursuant to Rule 804(a)(5) of the Tennessee Rules of Evidence and admit their preliminary hearing testimony. Noting that it was a post-conviction hearing versus a trial, the post-conviction court admitted the preliminary hearing transcript as an exhibit to the hearing. Further noting that the requested evidence consisted of testimony at a probable cause preliminary hearing where the witnesses were not cross-examined on the issue of self-defense, the court stated that it would give such evidence "the weight that it is afforded given those circumstances."

> On cross-examination, the Petitioner acknowledged that Mr. Mould testified at the preliminary hearing that he saw the Petitioner pull out a gun and shoot the victim in the chest and stomach. He insisted, nonetheless, that Mr. Mould's testimony would have been helpful because he described the victim as advancing on the Petitioner. As for Mr. Greer, the Petitioner believed he would have been helpful to his defense because he testified at the preliminary hearing that the victim had been in an altercation with the Petitioner earlier in the evening, that the victim had been

moving toward the Petitioner when he was shot, and that Mr. Greer had tackled the Petitioner after the shooting. The Petitioner agreed that Mr. Greer also testified that the Petitioner flashed a gang sign in the club at the victim and Mr. Greer, hit Mr. Greer inside the club, and threatened to kill Mr. Greer when Mr. Greer tackled him after he shot Mr. Greer's brother.

The Petitioner insisted that trial counsel promised that he would call both Mr. Greer and Mr. Mould as defense witnesses. He denied that counsel ever discussed the possibility that either witness would not be that helpful to the defense. He said Mr. Greer was sitting in the courtroom during the trial, but trial counsel never called him as a witness. Finally, the Petitioner expressed his belief that he would not have been convicted had trial counsel called Mr. Greer and Mr. Mould as defense witnesses.

Trial counsel testified that he had handled over fifty jury trials, including several murder trials, during his career. He said he met with the Petitioner numerous times and that the Petitioner was involved in every decision he made about the case. He stated that he reviewed the transcript of the preliminary hearing and hired an investigator to interview all the witnesses who had either testified at the preliminary hearing or given statements to the police.

Trial counsel agreed that both Joshua Mould and Jamison Greer potentially could have offered beneficial testimony for the defense at trial. He stated that he and his investigator went twice to Mr. Greer's home, located in a town south of Nashville, in an attempt to talk with him. Although there were vehicles in the driveway, no one answered the door. Trial counsel was confident that he left his contact information along with a request that Mr. Greer call him, but Mr. Greer never reached out to him.

Trial counsel testified that he attempted to talk with Mr. Greer during the trial, but Mr. Greer was hostile and uncooperative. Trial counsel said his co-counsel also attempted to talk to Mr. Greer, but she was unsuccessful. Trial counsel explained that he was very reluctant to call Mr. Greer as a witness because of his patent hostility and counsel's belief that he would attempt to "do as much damage to [the Petitioner] as he could." Trial counsel testified that he discussed his concerns with the Petitioner at the jail the night before they rested their defense. He recalled that his investigator was also present, as well as possibly his co-counsel. Ultimately, trial counsel made the strategic choice that it would be too risky to call Mr. Greer as a witness. Trial counsel testified that the Petitioner participated in the decision not to call Mr. Greer as a witness.

Trial counsel testified that he had relied on the State's subpoena of Mr. Mould as a witness for trial. Approximately one week before the trial began, trial counsel learned that the State had released Mr. Mould from its subpoena. Trial counsel, therefore, had his own subpoena issued on November 4. He said his investigator tracked Mr. Mould to a rehabilitation facility in Nashville and hired an investigative

11

firm from Murfreesboro to serve the subpoena. The rehabilitation facility, however, denied them access to Mr. Mould.

Trial counsel testified that he and his investigator met with the Petitioner on November 6 to inform him of their difficulty in serving Mr. Mould with the subpoena. He said they discussed the similarities in Mr. Mould's potential testimony to the testimony of other witnesses, but counsel also offered to contact the court to request a continuance of the trial until Mr. Mould was available. He said he left it up to the Petitioner to decide, and the Petitioner opted to proceed with the scheduled trial.

Trial counsel agreed that, even had he been available, Mr. Mould's testimony would not have been entirely favorable to the Petitioner, as the Petitioner did not have what counsel considered to be a "classic self-defense case." He said he informed the Petitioner that they would attempt to show that he acted in self-defense but the best outcome that he believed the Petitioner could expect was for the jury to find that he was provoked and return a verdict of guilty of voluntary manslaughter.

On cross-examination, trial counsel testified that he had a conversation with the Petitioner about the pros and cons of every potential witness. He said he told the Petitioner about Mr. Greer's hostility and expressed his belief that Mr. Greer would attempt to sabotage the Petitioner's case as much as he possibly could. He also explained to the Petitioner the pros and cons of requesting a continuance to call Mr. Mould as a witness. The Petitioner, who was in confinement pending the trial, was anxious to proceed with the trial. When asked if he had the Petitioner sign anything to acknowledge that he wanted to proceed despite Mr. Mould's unavailability, trial counsel replied that he could not locate anything in his file.

Trial counsel agreed that Mr. Mould's testimony could have been helpful but disagreed that it would have caused the jury to return a verdict of voluntary manslaughter. On this point, trial counsel pointed out that Mr. Mould's preliminary hearing testimony was not that he was trying to stop the victim from attacking the Petitioner, but instead that he was trying to stop him from confronting the Petitioner. Trial counsel said that, in hindsight, he should have issued a "double subpoena" for Mr. Mould and that he would not make the mistake of relying on the State's subpoena in the future.

On redirect examination, trial counsel testified that he never found any evidence that the victim attacked the Petitioner outside the nightclub.

On May 19, 2021, the post-conviction court entered a detailed written order denying the petition. Among other things, the court accredited the testimony of trial counsel that he discussed with the Petitioner the pros and cons of calling the witnesses, kept the Petitioner fully informed of his difficulties with Mr. Mould and Mr. Greer, and made the strategic choice, in consultation with the Petitioner, of not calling Mr. Greer as a witness and not requesting a continuance to secure Mr.

12

Mould's appearance at trial. The court further found that neither witness's testimony would have changed the outcome of the trial, in which multiple witnesses offered similar testimony and the proof of the Petitioner's guilt was overwhelming.

*Jackson v. State*, No. E2021-00642-CCA-R3-PC, 2022 WL 984341, at *2–5 (Tenn. Crim. App. Apr. 1, 2022), *perm. app. denied* (Tenn. Sept. 28, 2022) ("*Jackson II*"). The Tennessee Supreme Court denied discretionary review [Doc. 11-31].

Thereafter, Petitioner filed a timely federal habeas petition alleging that (1) trial counsel rendered ineffective assistance; (2) his sentence was excessive; (3) the state unlawfully suppressed testimony from Joshua Mould and discovery from John Lawson; (4) the methodology employed during jury selection deprived him of a peremptory challenge; and (5) the evidence was insufficient to support Petitioner's second-degree murder conviction [*See generally* Doc. 1]. The Court directed Respondent to respond to the petition and submit the state-court record [Doc. 6]. Subsequently, Respondent filed the state-court record[3] [Doc. 11] and his response to the petition [Doc. 14], to which Petitioner replied [Doc. 21]. This matter is now ripe for review.

## II.    LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). And when evaluating the evidence presented in state court, a federal

---

[3] The Court granted Respondent's motion to waive filing of the physical exhibits introduced at Petitioner's trial [Docs. 15, 17; *see also* Docs. 23, 24].

13

habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Williams*, 529 U.S. at 410–11. Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides

14

an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729, 731–32, 735 n.1 (1991).

The exhaustion principle requires a petitioner to have presented each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 302–03 (1984)). And the claim must have been "fairly presented" in that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 275, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state and the federal courts. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). In Tennessee, presentation of the claim to the TCCA satisfies this requirement. Tenn. S. Ct. R. 39.

But if a prisoner never presented a claim to the TCCA and a state procedural rule now bars presentation of the claim, because, for example, it is barred by Tennessee's one-year statute of limitation on post-conviction actions or its prohibition against second petitions, that claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Coleman*, 501 U.S. at 731–32, 750; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

15

In some circumstances, a procedural default may be circumvented to allow federal habeas review of a claim. But that is appropriate only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977).

The exception for a fundamental miscarriage of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is "actually innocent of the underlying offense[.]" *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, a viable claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

With regard to the "cause and prejudice" exception for procedural default, the "prejudice" sufficient to overcome a default must be actual, with the petitioner bearing "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

And "cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules. *See Coleman*, 501 U.S. at 753. Generally, errors of post-conviction counsel cannot serve as "cause" to excuse a

16

procedural default. *Id.* at 752. An exception to this rule was established in *Martinez v. Ryan*, which held that the inadequate assistance of post-conviction counsel or the absence of such counsel may, under certain circumstances, establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). The Supreme Court has described this exception as containing the following requirements:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a [Petitioner]'s procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel-claim;" and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez*, 566 U.S. at 13–14, 16–17). This exception, commonly referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

Therefore, when considering an ineffective assistance of trial counsel claim under *Martinez*, a petitioner must show the ineffectiveness of post-conviction counsel and "the 'substantial' nature of his underlying [ineffective assistance of trial counsel] claims." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). A substantial claim is one that "has some merit." *Martinez*, 566 U.S. at 14. Conversely, a claim is insubstantial if it "does not have any merit or . . . is wholly without factual support[.]" *Id.* at 15–16. And if the petitioner can successfully demonstrate cause and prejudice of post-conviction counsel under this preliminary review, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

However, the *Martinez* exception does not apply to a claim of ineffective assistance of trial counsel that a petitioner raised in the initial-review collateral stages and defaulted on appeal. *See,*

17

*e.g., Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals").  And when a petitioner relies on *Martinez* to excuse the procedural default of a claim of ineffective assistance of trial counsel that was not adequately developed in state court, a federal court may not consider any evidence beyond the state-court record to address the merits of the claim unless the petitioner satisfies the requirements in 28 U.S.C. § 2254(e)(2), even where the petitioner attributes that failure to the ineffective assistance of his post-conviction counsel.[4]  *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022); *see also Henderson v. Mays*, No. 12-5028/14-5911, 2023 WL 3347496, at *18 (6th Cir. May 10, 2023) (concluding that *Shinn* foreclosed consideration of evidence outside of state-court record that did not meet § 2254(e)(2)'s requirements "regardless whether the issue was adjudicated on the merits or procedurally defaulted, and regardless whether the evidence was previously thought to be appropriate for consideration under *Martinez*").

With these standards in mind, the Court turns to a consideration of Petitioner's claims.

## III.    ANALYSIS

### A.    Ineffective Assistance of Counsel

---

[4] Under 28 U.S.C. § 2254(e)(2), a federal court may not hold an evidentiary hearing and consider evidence not developed in state court unless:
(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

18

Petitioner raises several claims that trial counsel rendered ineffective assistance at his trial [Doc. 1, p. 11–15]. Federal courts examine such claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy a conjunctive, two-pronged test to establish the constitutionally ineffective assistance of counsel: (1) he must demonstrate constitutionally deficient performance by counsel; and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Id*. at 687. Deficiency is established when a petitioner can demonstrate that counsel's performance fell below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687–88. But a reviewing court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight[.]" *Id*. at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id*. at 687, 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the outcome. *Id*. at 691.

### 1. Claim Adjudicated on its Merits in State Court - Failure to Call Joshua Mould and Jameson Greer as Trial Witnesses

Petitioner argues that trial counsel rendered ineffective assistance in failing to call Joshua Mould and Jamison Greer as witnesses at trial, as they could have established that the victim was the aggressor, and that Petitioner shot the victim in self-defense [Doc. 1 p. 12–15]. Petitioner

presented this claim on post-conviction appeal, where the TCCA applied the *Strickland* standard and affirmed the judgment of the post-conviction court. *Jackson II*, 2022 WL 984341, at *5–7.

Petitioner argued during post-conviction proceedings that Mr. Greer's testimony that the victim was advancing on Petitioner would have aided Petitioner's self-defense argument, and that Mr. Mould's testimony that he had to physically restrain the victim from confronting Petitioner constituted "crucial, irreplaceable testimony" in support of Petitioner's argument that the victim was the initial aggressor. *Id*. at 6. But the post-conviction court credited trial counsel's testimony that (1) he had "fully communicated with the Petitioner about the difficulties with the potential witnesses," (2) "advised the Petitioner about his legitimate concerns with calling the victim's brother as a hostile defense witness," (3) "offered the Petitioner the choice of either requesting a continuance to attempt to secure the appearance of Mr. Mould or proceeding with the trial[,]" and (4) Petitioner chose to proceed with the trial as scheduled and agreed with "trial counsel's strategic choice not to risk calling Mr. Greer as a witness." *Id.*

Regarding Mr. Mould, Petitioner claims that he never was advised that Mr. Mould would not be at trial, nor did he have a discussion with trial counsel in which he decided to proceed with the trial without Mr. Mould's testimony [Doc. 21 p. 29–30]. But Petitioner testified to that at the post-conviction hearing [*see* Doc. 11-23 p. 18–19], and the trial court credited trial counsel's testimony over Petitioner's. And this Court must presume the trial court's credibility assessment is correct, because Petitioner has not rebutted it with clear and convincing evidence. *Mitchell v. Mason*, 325 F.3d 732, 737–38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)); *see also Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

The evidence presented at the evidentiary hearing is that trial counsel testified that Mr. Mould could possibly have been helpful and that he sought to subpoena him after trial counsel learned the state had withdrawn its own subpoena [Doc. 11-23, p. 48–49]. Mr. Mould was located but ultimately could not be served [*Id.* at 49]. Trial counsel stated he discussed with Petitioner whether to seek a continuance or to move forward, and Petitioner elected to move forward to trial [*Id.* at 50–51]. And because the post-conviction court credited trial counsel's testimony that he diligently sought to secure Mr. Mould's presence and ceased doing so only when Petitioner determined to proceed with trial without the witness, a fairminded jurist could agree with the state court that this was not deficient performance by trial counsel.

Also, Petitioner fails to demonstrate that he suffered any prejudice. Mr. Mould testified at the preliminary hearing, and a transcript of that hearing was admitted at the post-conviction hearing [Doc. 11-23 p. 24–25; Doc. 11-24]. And according to that transcript, Mr. Mould testified that he worked at The Battery the night of this offense and that there was an altercation of some form between Petitioner and the victim, which he did not see, and after which he escorted the victim outside to attempt to calm him [Doc. 11-24, p. 32–34]. Mr. Mould stated that when Petitioner walked back toward the club, the victim—against Mr. Mould's urging and his attempts to "pull him back"—went to confront Petitioner [*Id*. at 34, 36, 43]. At that point, Mr. Mould testified, Petitioner, who was standing still and at a distance of five to ten feet away, pulled a gun from his belt or pocket and shot the unarmed victim in the chest and stomach [*Id*. at 34, 37, 39, 41]. After the shooting, Mr. Mould began CPR on the victim, and other employees restrained Petitioner [*Id*. at 35, 37–38].

Mr. Mould's testimony corroborates other testimony that, following the initial altercation, Petitioner, who was initially unarmed, returned to The Battery while armed and immediately shot

the victim in the chest when the victim moved toward him [*See* Doc. 11-5, pgs. 113–14; Doc. 11-6, pgs. 32, 89, 92, 96]. And while Mr. Mould could have provided testimony that the victim was behaving aggressively outside The Battery, other witnesses also testified at trial that the victim was advancing toward Petitioner just prior to the shooting [*See* Doc. 11-6, pgs. 32, 71, 89, 95, 96]. Accordingly, a fairminded jurist could agree that Petitioner failed to prove he was prejudiced by the absence of Mr. Mould's trial testimony as it was consistent with other testimony at trial.

Regarding Mr. Greer, the victim's brother, trial counsel testified that he and his investigator tried to speak with Mr. Greer, who was "uncooperative completely" [Doc. 11-23 p. 45–46]. Trial counsel and his co-counsel both tried again to speak with Mr. Greer at trial, and Mr. Greer was "very hostile" [*Id.* at 46–47]. Trial counsel stated that he was hesitant to call Mr. Greer as a witness for the defense case, because he believed Mr. Greer "would get on the witness stand and try to do as much damage to [Petitioner] as he could" [*Id.* at 47]. Counsel testified that he discussed this with Petitioner several times during the course of his representation, and in the end, Petitioner agreed with the strategic decision not to call Mr. Greer to testify [*Id.* at 47–48, 51–52, 54–55]. Therefore, a fariminded jurist could agree that Petitioner failed to prove counsel performed deficiently in failing to call Mr. Greer as a defense witness.

Also, Mr. Greer testified at the preliminary hearing that the victim and Petitioner had an altercation prior to the shooting, after which the victim went to the bar [Doc. 11-24, p. 94]. Mr. Greer stated he then saw Petitioner make "gang signs[,]" which he interpreted as a "kind of death threat[,]" so he approached Petitioner to ask him why he was making gang signs [*Id.* at 94, 111]. In response, Petitioner hit Mr. Greer in the mouth, and Mr. Greer struck back [*Id.* at 94]. Mr. Greer stated that bouncers broke up the fight, and Mr. Greer was escorted outside, where he saw Petitioner shoot the victim twice in the chest [*Id.* at 94–96]. Mr. Greer alleged he rushed to get the

22

pistol from Petitioner, and as they struggled over the gun, Petitioner told Mr. Greer he would kill him [*Id*. at 97]. During that interaction, Mr. Greer was shot twice in the back [*Id*.].

Thus, Mr. Greer's testimony would have provided minimal, if any benefit to Petitioner, but it could have opened the door to the admission of damaging evidence, including testimony that Petitioner behaved violently in the club, flashed gang signs, and threatened to kill Mr. Greer. *See Jackson II*, 2022 WL 984341, at *6. A fairminded jurist could, therefore, agree that Petitioner failed to prove prejudice on this claim.

Accordingly, the Court finds the TCCA's decision rejecting this claim was not based on an unreasonable determination of facts in light of the evidence presented, nor was it contrary to, or based upon an unreasonable application of, *Strickland* and its progeny. Petitioner is not entitled to relief on this claim.

## 2. Claims Not Exhausted in State Court

Petitioner's remaining claims that trial counsel rendered ineffective assistance of counsel were not exhausted through presentation of the federal claim to the TCCA. *See Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003) (finding presentation of claim to TCCA sufficient to exhaust state remedies); *see also* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust state remedies). Because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust these claims, they are technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657 ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

As such, the Court may review the merits of these claims only if Petitioner establishes cause and prejudice to excuse the defaults, or that a fundamental miscarriage of justice would result if the Court did not consider them. *See, e.g., Coleman*, 501 U.S. at 749–50. Petitioner does not argue his actual innocence, and the Court finds the exception for a fundamental miscarriage of justice inapplicable in this case. But Petitioner does argue that the exception set forth in *Martinez* qualifies as cause to excuse these defaults [*See* Doc. 21 p. 19–20]. Therefore, the Court considers the applicability of *Martinez* to each of the ineffective assistance of counsel claims that follow.

### a. Failure to Investigate, Prepare, and Execute Effective Trial Strategy

Petitioner argues that "[t]rial counsel did not properly investigate and prepare for the trial in this matter, and as a result, employed seriously defective trial strategy, and was not prepared for both direct and cross-examination of the State's witnesses . . . ." [Doc. 1, p. 11]. Respondent argues that this claim is not supported by sufficient facts to satisfy Habeas Rule 2(c) [Doc. 14 p. 35 n.3]. The Court agrees, and this provides a sufficient basis for the dismissal of this claim. *See* Habeas Rule 2(c) (requiring petition "specify all grounds for relief" and "state the facts supporting each ground"); *see also Rogers v. Mays*, 69 F.4th 381, 398 (6th Cir. 2023) ("Rogers violated [Habeas Rule 2(c)] by devoting just one sentence to this claim in his amended habeas petition.").

Nonetheless, the Court notes that in initial post-conviction proceedings, Petitioner claimed trial counsel performed deficiently in investigating and preparing for trial on the indicted offenses and in presenting evidence supporting his claim of self-defense[5] [Doc. 11-22, p. 33–42]. But the

_____

[5] The claim was not reasserted in the amended petition nor specifically addressed in the trial court's order, but it was before the court for its consideration. *See Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) (recognizing that appellate courts can consider post-conviction claims formally raised in post-conviction petition or claims argued at the post-conviction hearing and decided by the trial court without objection).

claim was not exhausted through its presentation to the TCCA on appeal [*See generally* Doc. 11-25].  And because the *Martinez* exception does not apply to excuse default of claim raised in initial-review post-conviction proceedings but not raised on appeal, *see West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015), Petitioner cannot rely on *Martinez* to overcome the default.

However, even if *Martinez* did apply, Plaintiff's claim is not substantial.  Trial counsel testified at the post-conviction evidentiary hearing (1) that he has conducted approximately fifty jury trials [Doc. 11-23, p. 44]; (2) regarding his trial preparation, which included reviewing the preliminary hearing transcript and hiring an investigator that interviewed witnesses identified by Petitioner and those witnesses who had given statements [*Id.* at 44–45]; (3) that Petitioner was involved in "every decision in this case" [*Id.* at 51]; (4) that he had met with Petitioner numerous times and reviewed the defense plan [*Id.*]; (5) that he had had conversations with Petitioner about every witness they had considered calling and the pros and cons for that, and that it was ultimately Petitioner's decision as to what proof was presented [*Id.* at 53, 62]; and (6) that they unsuccessfully tried to find witnesses to help establish provocation by the victim outside the club before the shooting [*Id.* at 61–62].  And trial counsel testified that he and Petitioner discussed his prior convictions and "how he would come across to the jury" in deciding whether Petitioner would testify in his own defense [*Id.* at 64].

Additionally, through trial counsel's efforts, the trial court dismissed the second-degree murder count and reduced the aggravated assault to simple assault [*See* Doc. 11-1, p. 39, 42; Doc. 11-8, p. 17].  Also, the jury ultimately convicted Petitioner on the lesser-included offenses of second-degree murder and misdemeanor reckless endangerment, in addition to simple assault

[Doc. 11-1, p. 66–68]. Therefore, Petitioner has not presented a substantial claim that trial counsel was ineffective in investigating, preparing, and conducting the trial.[6][7]

Furthermore, there is no substantial claim of prejudice, in view of the overwhelming evidence of Petitioner's guilt for second-degree murder and the absence of proof as to what additional evidence might have been developed had counsel somehow acted differently when preparing for and conducting trial. *Hutchison v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and

---

[6] In his reply brief, Petitioner argues that trial counsel rendered ineffective assistance in failing to impeach John Calandros' trial testimony—that the victim walked calmly toward Petitioner because he had calmed down while outside The Battery— with his testimony at the preliminary hearing—that the victim was out for revenge when he approached Petitioner outside The Battery [Doc. 21 p. 23–28]. But Petitioner waived this argument by raising for the first time in his reply brief. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

The Court otherwise notes that at trial, Mr. Calandros testified that the victim "was riled up" and stating "I've got bail money" before becoming "calm by the time he started walking toward. . . his car" to go home [Doc. 11-6 p. 35, 60–61]. He also testified on cross-examination that a group of people outside were urging the victim to "get" Petitioner outside, and that the victim walked toward Petitioner in response to that taunting [*Id.* at 70, 71]. And defense counsel questioned the credibility of Mr. Calandros' testimony at trial that the victim had "calmed down" by asking whether it was Mr. Calandros' testimony "that a man that has been so upset just a few minutes ago, 'I've got bail money I don't care what happens, he's just walking up to [Petitioner] very calmly?" [*Id.* at 72]. Therefore, trial counsel attempted to cast doubt on Mr. Calandros' characterization of the victim's demeanor outside of The Battery, and Petitioner cannot demonstrate that he was prejudiced by trial counsel's failure to specifically reference Mr. Calandros' preliminary hearing testimony.

[7] Petitioner also states in his reply brief that trial counsel "completely failed to investigate John Lawson" and claims that (1) he was not the person who turned over the murder weapon the night of the shooting, as he testified; (2) he never identified Petitioner prior to his in-court identification at trial; and (3) there was no mention of him in discovery [Doc. 21 p. 37]. Aside from Petitioner having waived this argument by not presenting it in his initial brief, *see Sanborn*, 629 F.3d at 579, the Court notes that the record reflects that any conflict as to who turned over the gun was explored at Petitioner's trial [*see* Doc. 11-6 p. 43–44, 90–91, 118–19], there is no proof in the record regarding Petitioner's discovery and pre-trial identification claims, and the State identified Mr. Lawson as a potential witness in advance of Petitioner's trial [Doc. 11-1 p. 27–28].

how such evidence would have been material.").  Petitioner may not now develop or present any such proof, as he cannot meet one of the narrow circumstances for evidentiary development under § 2254(e)(2).  *See* 28 U.S.C. § 2254(e)(2) (providing that outside of two limited exceptions, a federal court may not hold an evidentiary hearing on a claim when the petitioner "failed to develop the factual basis" of the claim in state court); *Shinn*, 596 U.S. at 382 (holding petitioner may not rely upon alleged ineffectiveness of post-conviction counsel to develop record in federal proceedings even when petitioner relies upon alleged ineffective assistance by post-conviction counsel to excuse a procedural default under *Martinez*).  Accordingly, this claim is procedurally defaulted, and the Court cannot consider its merits.

### b. Plea Offers

Petitioner alleges that trial counsel "did not adequately relay plea offers" and did not "adequately investigate or explain the consequences of the resolution of charges against" him, which "probably would have swayed [his] decision to go to trial in this case" [Doc. 1 p. 12].[8] Petitioner failed to raise this claim in state court.

Petitioner cannot rely on *Martinez* to excuse the default of this claim, as it is not substantial. There is no readily apparent evidence on this claim within the state-court record because Petitioner and/or his counsel did not raise it and develop proof on it.  And Petitioner may not present or develop any such proof now, as he cannot meet one of the narrow circumstances for evidentiary development under § 2254(e)(2).  *See* 28 U.S.C. § 2254(e)(2); *Shinn*, 596 U.S. at 382. Therefore, this claim is procedurally defaulted, and the Court cannot consider its merits.

---

[8] The Court agrees with Respondent's assertion that this claim is not supported by sufficient facts to satisfy Habeas Rule 2(c) [Doc. 14 p. 38 n.4].  *See* Habeas Rule 2(c); *Rogers*, 69 F.4th at 398.

### c.     Cross-Examination of John Lawson

Petitioner claims that trial counsel was ineffective in not preparing for the cross-examination of John Lawson, a patron of The Battery the night of the shooting,[9] as Mr. Lawson "offered the *only* testimony that the victim was not making threatening moves or advancing towards" Petitioner [Doc. 1, p. 15 (emphasis in original)].  But Petitioner never presented this claim in state court.  And Petitioner cannot rely on *Martinez* to excuse its default, as it is not substantial.

At trial, Mr. Lawson testified that he saw Petitioner "walk up the steps, pull a weapon from his pants, and shoot the victim in the chest from a distance of four to five feet." *Jackson I*, 2018 WL 3409927, at *4.  He stated that the victim "was not moving toward [Petitioner] at the time of the shooting[,]" and that the victim "kind of froze" before Petitioner pulled out a gun.  *Id.* According to Mr. Lawson, he tackled several others to the ground when the shooting began, and Petitioner fired until he "ran out of rounds[,]" which Mr. Lawson heard to be "maybe even more" than eight to ten shots.  *Id.*

At trial, defense counsel cross-examined Mr. Lawson and highlighted what the witness could and could not see from his vantage point [Doc. 11-6, pgs. 122–29].  Counsel also elicited testimony that Mr. Lawson did not witness what happened inside the club prior to the shooting [*Id.* at 124].  And because Petitioner did not raise this claim in his post-conviction petition and did not develop proof concerning it at the evidentiary hearing, there is no proof in the record about what a different cross-examination would have yielded.  Petitioner may not develop such proof now. *See, e.g.,* 28 U.S.C. § 2254(e)(2); *Shinn*, 596 U.S. at 382.  Accordingly, Petitioner cannot show

---

[9] Mr. Lawson began working at The Battery as a disc jockey "a few weeks after" the shooting [*See* Doc. 11-6 p. 108].

that this ineffective assistance of counsel claim is substantial, and this claim is procedurally defaulted from review.

### d.     Jury Sequestration

Petitioner claims that trial counsel provided ineffective assistance by "failing to ensure that the jurors" were sequestered, thus "allowing their access to media and outside influences which tainted [his] rights to a fair jury trial" [Doc. 1, p. 15].  This claim was never raised in state court.

Because Petitioner never presented any proof on this issue in his evidentiary hearing on the post-conviction petition, there is no basis to suspect that the case compelled jury sequestration, nor is there evidence that such a request would have been granted and the outcome of the proceeding effected in some way.  Petitioner may not develop any such proof now.  *See, e.g.,* 28 U.S.C. § 2254(e)(2); *Shinn*, 596 U.S. at 382.  Accordingly, there is no proof to render this claim substantial within the meaning of *Martinez*, and this claim is procedurally defaulted from review.

### B.     Excessive and Disproportionate Sentence

Petitioner claims that his forty-year sentence for second-degree murder is cruel and unusual punishment in violation of the Eighth Amendment because "it represents an excessive and disproportionate sentence in the context of the facts that were in possession of the litigants, and thus violates the dictates set forth in *Solem v. Helm*, 483 U.S. 277 (1983) and *Harmelin v. Michigan*, 501 U.S. 957 (1991)" [Doc. 1 p. 16].   But Petitioner never raised this claim in state court.

Instead, on direct appeal, Petitioner unsuccessfully challenged this sentence as a Range II multiple offender under Tennessee law [Doc. 11-15 p. 35–37].  And because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust the federal claim presented here, the claim is technically exhausted but procedurally defaulted.  *See* 28 U.S.C. § 2254(c); *Atkins*,

792 F.3d at 657 ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule).

Thus, the Court may review the merits of Petitioner's claim only if he establishes cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would result if the Court did not consider it. *See, e.g., Coleman*, 501 U.S. at 749–50. Petitioner fails to do so. Accordingly, this claim is procedurally barred from review.[10]

### C. *Brady v. Maryland*

Petitioner claims that the prosecution violated the constitutional mandate set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to (1) call designated witness, Joshua Mould, as a trial witness and (2) turn over the full discovery and witness statements concerning John Lawson [Doc. 1 p. 16].

Petitioner did not present either of these claims in state court. And because Petitioner no longer "has the right under the law" of Tennessee to properly exhaust the federal claims presented here, the claims are technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657; *see also* Tenn. Code Ann. § 40-30-102(a) and § 40-30-102(c). Petitioner has not identified any basis to excuse the default of these claims.

Because these claims were not presented in state court, there is no state-court record to

---

[10] Petitioner cannot rely on *Martinez* to excuse the default, because the claim is not one of ineffective assistance of trial counsel. *See Davila v. Davis*, 582 U.S. 521, 524–25 (2017) (reiterating that *Martinez* exception does not extend beyond claims of ineffective assistance of trial counsel); *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 716 (6th Cir. 2015) ("*Martinez* applies only to claims of ineffective assistance of trial counsel, not trial errors or claims of ineffective assistance of appellate counsel.").

establish their potential merits.  Petitioner may not expand the record to develop or present such proof now, as he cannot satisfy one of the narrow circumstances of § 2254(e)(2) for evidentiary development in this Court.  *See, e.g.,* 28 U.S.C. § 2254(e)(2); *Shinn*, 596 U.S. at 382.

The Court otherwise finds that these claims fail on their merits.  To establish a *Brady* claim, a petitioner must show that the state withheld evidence favorable to the accused and material to either the petitioner's guilt or punishment.  *Brady*, 373 U.S. at 87.  The Supreme Court has articulated "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks and citation omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks and citation omitted).

Mr. Mould's identity, and the evidence to be gleaned from him, were not suppressed.  Instead, the state withdrew its subpoena for his trial appearance, after which defense counsel tried but failed to secure his appearance.  Petitioner offers no explanation as to how this could qualify as a *Brad*y claim.  Petitioner likewise does not identify any discovery or statements from Mr. Lawson that were, in his view, suppressed by the state.  And Mr. Lawson testified as part of the state's proof at trial.  Therefore, there is nothing readily apparent in the record from which the

Court could conclude that some evidence favorable to the accused was in the state's possession and actually suppressed.[11]   Accordingly, this claim is procedurally defaulted.

## D.      Peremptory Challenges

Petitioner argues that he was deprived of the right to an impartial jury trial, as guaranteed by the Sixth Amendment, and the right to due process, as guaranteed by the Fourteenth Amendment, by the trial court's "method of empaneling additional jurors," which resulted in the purported loss of one of Petitioner's peremptory challenges [Doc. 1 p. 16–17].  He maintains that this is a structural error requiring reversal [*Id.* at 17 (citing *Arizona v. Fulminate*, 499 U.S. 279, 306 (1967))].

Tennessee law provides:

The trial court may use either of the following methods to select and impanel additional jurors:

(A) Single Entity. During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

(B) Separate Entities. Following the selection of the jury of twelve regular jurors, the additional jurors shall be selected and impaneled as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

---

[11] In his reply, Petitioner argues that the prosecution presented false testimony to the jury through Mr. Lawson, in violation of *Giglio v. United States*, 405 U.S. 153-54 (1972), and he contends that Mr. Lawson was a surprise witness [Doc. 21 p. 32, 33].  Petitioner waived this argument by raising it for the first time in his reply brief.  *See Sanborn*, 629 F.3d at 579. Regardless, as the Court previously noted, Mr. Lawson was on the state's potential witness list [Doc. 11-1 p. 27–28].  And, otherwise, Petitioner has not stated a *Giglio* violation, as he has presented proof that the prosecution presented material evidence that they knew was "indisputably false[.]" *See Abdus–Samad v. Bell*, 420 F.3d 614, 625–26 (6th Cir. 2005) (citation omitted).

32

Tenn. R. Crim. P. 24(f)(2).  At Petitioner's trial, the trial court used the separate entity method to select jurors and alternates, but the single entity method to choose which jurors would be excused as alternates [*See* Doc. 11-4, p. 71–78].  Petitioner argued at trial that he "lost" a peremptory challenge using this method, because he had one peremptory challenge remaining when the initial twelve jurors were selected [*Id.*].  And at the conclusion of the evidence, two jurors were randomly chosen to be excused: one of the original twelve and one of the alternates [Doc. 11-1, pgs. 75–76].  Thus, Petitioner argued, his verdict was returned by a juror elected as an alternate juror using the separate entity method who "should not have been elevated to the jury of twelve" [*Id.* at 76].

On direct appeal, Petitioner raised a state-law challenge to the trial court's method of selecting alternate jurors [Doc. 11-15, pgs. 19–27].  He claimed the trial court "failed to adhere to the jury selection process prescribed in Rule 24(f)(2) of the Tennessee Rules of Criminal Procedure" [*Id.* at 19].  Petitioner's primary reference to a constitutional right was contained in a block quote from *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993), on "the relationship between a defendant's constitutional rights to an impartial jury and the use of peremptory challenges" [*Id.* at 19–20].

In rejecting Petitioner's claim, the TCCA found the trial court erred under Tennessee Rule of Criminal Procedure 24.  *Jackson I*, 2018 WL 3409927, at *10.  It noted that a trial court's "deviation from jury selection procedures is considered non-constitutional error[,]" and applying the review required by Tenn. R. App. P. 36(b) for review of state-law errors, it found Petitioner failed to prove "the error more probably than not affected the judgment or caused prejudice to the judicial process."  *Jackson I*, 2018 WL 3409927, at *10.  It determined that the trial court's "deviation from Rule 24" did not "cause[] prejudice to the judicial process" in this case, because Petitioner "received, in substance, what the rule affords[,]" and it noted "[t]he jury acquitted him

33

of the charged offenses, including first degree murder, and convicted him of lesser included offenses." *Id*.

Respondent argues that since this issue was raised and resolve on state-law grounds, the federal habeas claim presented to this Court was not exhausted [Doc. 11-14, p. 44]. The Court finds this argument persuasive, as Petitioner's legal theory in state court relied entirely on the state-law requirements for jury selection. *See, e.g., Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987) (rejecting petitioner's assertion that a "catch-all" provision or generalized terminology in his petition for habeas corpus adequately apprized the state court of the constitutional theory to be relied upon at appellate review, where the only legal theory presented to the state courts was based entirely upon state evidentiary law); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) ("General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688–89 (2d Cir. 1984))). Therefore, the Court finds this claim procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins*, 792 F.3d at 657; *see also* Tenn. Code Ann. § 40-30-102(a) and § 40-30-102(c). And Petitioner has not identified any basis to excuse the default of these claims.

Alternatively, if the Court were to find that Petitioner sufficiently asserted his federal constitutional claim in state court, then the Court must apply AEDPA deference to the state-court's adjudication of this claim. *See* 28 U.S.C. § 2254(d). And "it is well settled that the loss of a peremptory challenge does not violate a defendant's constitutional right to an impartial jury because 'peremptory challenges are not of constitutional dimension.'" *Beuke v. Houk*, 537 F.3d 618, 638 (6th Cir. 2008) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)). Petitioner makes no claim that the jury seated in this case was not impartial. Instead, he challenges the trial court's failure to follow a state rule, which the state court correctly found not to qualify as a constitutional

violation. Accordingly, Petitioner can show no basis for the Court to conclude that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established law, or that it was based on an unreasonable determination of facts in light of the evidence presented. Thus, in the alternative, Petitioner is not entitled to relief on this claim.

### E.  Sufficiency of the Evidence

Petitioner maintains "[t]hat the evidence against [him] was insufficient beyond a reasonable doubt[,]" citing *Jackson v. Virginia*, 443 U.S. 307 (1979) [Doc. 1 p. 17]. But he advances no facts to support this claim, and therefore, it is insufficiently pled under Habeas Rule 2(c). *See* Habeas Rule 2(c); *Rogers*, 69 F.4th at 398.

Nevertheless, the Court notes that evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). This standard acknowledges the factfinder's role to resolve all conflicts in testimony, weigh the evidence, and "draw reasonable inferences from basic facts to ultimate facts." *Id*. And a habeas court reviewing a properly exhausted *Jackson* claim affords it a doubly deferential standard of review. *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, a court reviewing the verdict can set it aside "only if no rational trier of fact could have agreed with the jury." *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 4 (2011)). Second, a federal habeas court must account for the statutory deference under § 2254(d) allotted to the state-court's review of the jury's findings. *Id*. Thus, a habeas court reviewing the state court may overturn the state court's decision "only if the state court decision was objectively unreasonable." *Id*. (internal quotation marks omitted).

In evaluating the sufficiency of the evidence against Petitioner, this Court must examine

Case 3:23-cv-00054-DCLC-JEM   Document 25   Filed 07/30/24   Page 35 of 37   PageID #: 1916

the "substantive elements of the criminal offense" under state law. *Jackson*, 443 U.S. at 324 n.16. Petitioner challenged the sufficiency of the evidence to support his second-degree murder conviction on direct appeal, where the TCCA cited and applied *Jackson*, noting that Tennessee defines second-degree murder "as a knowing killing of another. . . . [and] [a] knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death." *Jackson I*, 2018 WL 3409927, at *6–7 (internal citations omitted). [12]

The TCCA's rejection of this claim was not unreasonable. The issue of self-defense was presented to the jury, which found Petitioner not guilty of first-degree murder and guilty of second-degree murder [*See* Doc. 11-9 p. 123]. A fairminded jurist would conclude that a reasonable juror could have reached this conclusion under the record, which contained evidence that an initial altercation occurred between the Petitioner and victim inside the club, after which Petitioner chose to leave, go to his vehicle, retrieve his gun, return to the club, and shoot the unarmed victim multiple times. And because the evidence presented at trial was sufficient for a rational factfinder to convict Petitioner second-degree murder beyond a reasonable doubt, the TCCA's adjudication of this claim was not contrary to, or based on an unreasonable application of *Jackson*. Petitioner is not entitled to relief on this claim.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists

---

[12] According to Respondent, Petitioner remains confined only on his second-degree murder conviction [Doc. 1 p. 17].

would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added). Applying this standard, the Court concludes that a COA should be denied as to all claims raised in the petition.

## V.     CONCLUSION

For the reasons set forth above, Petitioner has failed to demonstrate an entitlement to federal habeas relief. Therefore, the instant petition will be **DENIED**, and this action is **DISMISSED WITH PREJUDICE**. A certificate of appealability from this decision will be **DENIED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED:**

s/Clifton L. Corker
United States District Judge

37